**MCBRIDE COTTON AND CATTLE CORPORATION, et al.,**
**Plaintiffs,**

v.

**Ann VENEMAN, Secretary of the United States Department of Agriculture, Defendant.**

**No. 99–824–PHX–ROS.**

United States District Court,
D. Arizona.

Sept. 5, 2003.

James T. Massey, Sisters, OR, Gary Doyle Condra, Merinda Kathryn Condra, Condra & Condra, Lubbock, TX, for Plaintiffs.

Jason R. Baron, Thomas W. Millet, Daniel Bensing, Timothy Zick, Washington, DC, Arthur G. Garcia, Phoenix, AZ, for Defendant.

## ORDER

SILVER, District Judge.

Pending before the Court are cross-motions for summary judgment. On February 10, 2003, Plaintiffs filed a Motion for Summary Judgment [Doc. # 96], and on March 31, 2003, Defendant, the Secretary of Agriculture, filed her Motion for Summary Judgment [Doc. # 109]. The Court held a hearing on these motions on August 27, 2003. The Court concludes that Defendant's Motion for Summary Judgment will be granted.

## I. Factual and Procedural Background

This case is on remand from the Ninth Circuit. On September 25, 2000, the Court dismissed the case for lack of subject matter jurisdiction, concluding that Plaintiffs failed to exhaust their administrative remedies. Order of Sept. 25, 2000 [Doc. # 74]. The Ninth Circuit reversed, holding that Plaintiffs' failure to exhaust administrative remedies was not a jurisdictional bar and that the failure to exhaust should be excused. *McBride Cotton & Cattle Corp. v. Veneman,* 290 F.3d 973 (9th Cir.2002). Having resolved the jurisdictional issues, the Ninth Circuit "remand[ed] all of [Plaintiffs'] claims to the district court for consideration on the merits." *Id.* at 982. The Ninth Circuit did not reach the merits of Plaintiffs' claims, and the merits are now at issue before the Court on the cross-motions for summary judgment.

The facts have been previously summarized in this Court's September 2000 Order and the Ninth Circuit's opinion in *McBride.* The Ninth Circuit summarized the facts as follows:

The five plaintiffs operate family farm businesses which receive contractual payments from farm programs administered by the United States Department of Agriculture's (USDA) Commodity Credit Corporation (CCC). Each plaintiff has at least one shareholder, member, or beneficiary who is a delinquent debtor on an agricultural loan administered by the USDA. None of the plaintiffs is a delinquent debtor. Through administrative offset, the Secretary of Agriculture took pro-rata shares of contractual payments owed to the non-debtor plaintiffs to satisfy delinquent debts owed by the respective individual debtors. In effecting these offsets, the Secretary gave notice to the individual debtors of the intent to offset and of available administrative remedies. As a matter of policy, however, the Secretary has interpreted the regulations as not requiring such notice to be given to the non-debtor entities.

On March 5, 2003, Plaintiffs filed a Second Amended Complaint, adding two new Plaintiffs, Square B, Inc. and GRH Land & Cattle Co.[1] Like the original Plaintiffs, the new Plaintiffs are non-debtor entities with at least one shareholder, member, or beneficiary who is a delinquent debtor on a farm loan administered by the USDA. In this case, both have at least one shareholder who is a delinquent debtor on an agricultural loan administered by the Farm Service Agency (FSA). Decl. of Condra ¶¶ 4–7 [Doc. # 99]. Through administrative offset, the Secretary has taken pro rata shares of contractual payments owed to these Plaintiffs to satisfy the debtors' delinquent debts, again without notice to

---

1. The Plaintiffs originally brought this suit as a class action on behalf of all others similarly situated. A motion for class certification was pending and denied as moot when the Court originally dismissed the case for lack of jurisdiction. Following remand from the Ninth Circuit, the Plaintiffs have not sought class certification and their summary judgment motion specifically moves on behalf of themselves only. The Court considers the issue of class certification waived, and also moot upon the entry of judgment against Plaintiffs.

the Plaintiff non-debtor entities. *Id.* at ¶ 8.[2]

One notable fact about the Secretary's actions is that though the CCC offset the debts against the Plaintiffs, the debts were owed (by non-Plaintiff debtors) to Farm Service Agency (FSA), a separate agency of the Department of Agriculture. In this case, Plaintiffs have entered into production flexibility contracts ("PFCs") with the CCC. These PFCs are authorized by 7 U.S.C. § 7211, and set the terms for production and management of cropland in return for federal payments. The CCC conducted its administrative offset through the administration of this program. However, the Secretary concedes that the Plaintiffs have no debts "due" to the CCC. The Secretary notes that "[i]n this suit, however, the plaintiff entities do not owe a 'debt' to CCC; rather, the debts are owed by individual farmers participating in the plaintiff family operations [and the] plaintiff entities' rights are governed by [7 C.F.R.] §§ 1403 and 792." Def's Memorandum [Doc. # 115] at 9, n. 10. Therefore, the individuals' debts are owed to the FSA, not to the CCC.

The Second Amended Complaint lists six claims for relief: (1) unlawful takings without just compensation in violation of the Fifth Amendment; (2) deprivation of property without meaningful procedures to challenge the deprivation in violation of the Due Process Clause of the Fifth Amend-ment; (3) unlawful seizure in violation of the Fourth Amendment; (4) a claim that the Secretary exceeded her authority under Congressional authorization; (5) a claim that the Secretary violated the mandates of the Federal Claims Collection Act and applicable regulations; and (6) violations of unnamed rights "created and afforded under state law." *Id.* at ¶ 121. The claims are brought pursuant to the Court's authority to review agency actions under the Administrative Procedures Act, 5 U.S.C. §§ 702–706. In particular, § 706(2) provides that the Court reviewing agency action shall "hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law . . ."

Aside from the sixth claim,[3] Plaintiffs present two types of claim in the Second Amended Complaint: challenges to the Secretary's statutory authority (the fourth and fifth claims) and challenges to the constitutionality of the Secretary's actions (the first, second, and third claims). The Court will first analyze the statutory challenges and determine if the Secretary's actions were authorized by law

---

**2.** In the case of Square B, the Secretary withheld pro rata payments to offset the debts on FSA loans to Charles P. Bodkin, who is a 50 percent shareholder in Square B. Def.'s SSOF [Doc. # 111] at ¶¶ 1–12. In the case of GRH, the Secretary withheld pro rata payments to offset the debts on FSA loans to Gary R. Hooten, who is a 50 percent shareholder in GRH. *Id.* at 13–25.

**3.** The premise of Plaintiffs' sixth claim is that the Secretary disregarded the corporate form of Plaintiff entities, established under state law, by collecting the debts of the entities' shareholders. However, there are no citations to specific state laws in Plaintiffs' Second Amended Complaint. In their motion papers, Plaintiffs assume that the corporate form of the Plaintiff entities acts as a defense to the Secretary's actions. This theory is discussed in the next section regarding the CCC's contract power; whether or not the analysis is correct, it does not form the basis of an independent claim as stated in the Second Amended Complaint.

## II. Analysis

### A. Statutory Authority

Initially, Plaintiffs argue that the CCC had no statutory authority to collect the debts owed by the individual debtors to the FSA, and therefore could not collect them using administrative offset against the Plaintiffs. Although there is a tangled web of regulations governing the Secretary's offset actions at issue here, the Secretary has stated that "the CCC, in making the offsets at issue acted exclusively pursuant to its independent statutory and regulatory offset authority, *see* 7 U.S.C. § 714b(k); 7 C.F.R. § 1403.7, as well as its contractual rights under the PFC contracts that plaintiffs signed." Def.'s Memorandum [Doc. # 115] at 6.[4] Therefore, the Court must determine if the CCC was authorized by statutory authority or by the terms of the contract to conduct the administrative offset.

### (1) Does the CCC have the authority to collect debts owed to the FSA against non-debtors under 15 U.S.C. § 714?

The Secretary's first argument is that the CCC offset the payments pursuant to its own statutory and regulatory authority. The Secretary relies on 7 C.F.R § 1403.7, which governs the CCC's "[c]ollection by administrative offset." Section 1403.7 clearly contemplates that the CCC may collect debts that are due to other agencies. For example, § 1403.7(j)(1) provides that "[d]ebts due any agency other than CCC shall be offset against amounts payable by CCC *to a debtor* when an agency of the U.S. Government has submitted a written request [complying with number of procedures]." (emphasis added). Section 1403.7(1) lists the priority of debts that should be collected by offset, with debts to the CCC ranked ahead of debts to other agencies of the USDA, in turn ranked ahead of debts to other government agencies. Importantly, these provisions govern only when the *debtor itself* receives payments from the CCC. By their plain language, these provisions refer to the CCC's authority to collect debts owed by the actual entity receiving payments, not debts owed by the shareholder of an entity receiving amounts payable from the CCC.[5]

To conduct administrative offset against a non-debtor entity, the CCC relies on § 1403.7(q), which provides that "[a]ny action taken [by the CCC] by the provisions of this section may be taken: (1)[a]gainst a debtor's pro rata share of payments *due any entity which the debtor participates in,* either directly or indirectly, as determined by CCC." (emphasis added). This provision allows the CCC to assess if the debtor "participates" in an entity, and conduct a pro rata administrative offset against that entity if it so determines.

---

4. In her Reply, the Secretary makes a new argument that summary judgment is inappropriate because the Secretary may defend the offsets on the basis of "state common law defenses" such as a determination that the corporations are alter egos of the individual debtors. The Secretary argues that this defense will require individualized factual determinations by the Court or at trial, though the Secretary acknowledges that the Department of Agriculture *has not* made these factual determinations. Plaintiffs have moved to strike this argument [Doc. # 128] because no such factual issues were raised in the Secretary's Motion or Response to the Plaintiffs' Motion.

The Court need not consider whether to address this issue because it is rendered moot by the grant of summary judgment for the Secretary.

5. There is no specific definition of "debtor" in 7 C.F.R § 1403.3, which sets forth the applicable definitions for this part of the regulations. Therefore, "debtor" is construed by its plain meaning to be an individual or entity who owes a debt, as distinguished from a corporation or other entity in which a debtor participates but which does not itself owe a debt.

Further, since the CCC is authorized to offset "debts due any agency other than the CCC," it may offset payments of debts due to other agencies, such as the FSA. 7 C.F.R. § 1403.7(j)(1).

Plaintiffs argue that this regulation, § 1403.7(q), is invalid because it exceeds the CCC's authority. Plaintiffs argue both that the CCC has no power to collect the debts of another agency *at all,* and that even if the CCC had the authority to collect debts due to another agency, it had no authority to collect debts from *non-debtor* entities. The Court finds the Plaintiffs' argument unpersuasive.

■ Generally, because the United States is considered a unitary creditor, individual agencies may collect the debts of other agencies if the collecting agencies are authorized to do so. *Cherry Cotton Mills v. United States,* 327 U.S. 536, 539, 105 Ct.Cl. 824, 66 S.Ct. 729, 90 L.Ed. 835 (1946); *see In re Hal, Inc.,* 122 F.3d 851, 852–53 (9th Cir.1997) ( "The Supreme Court clearly adopted the unitary setoff rule for government agencies in the non-bankruptcy context in *Cherry Cotton Mills.*"). As the Tenth Circuit has noted, "[t]here cannot be much debate that outside of the bankruptcy context, the United States is treated as a unitary creditor, and agencies of the United States government ... may set off debts owed by one agency against claims that another has against a single debtor." *Turner v. Small Bus. Admin.,* 84 F.3d 1294, 1296 (10th Cir.1996) (*en banc* ).

In this case, the question is whether the CCC has been statutorily granted such authority by Congress to collect debts due to another USDA agency, particularly the FSA. Notably, the Secretary relies *solely* on the CCC's power under the CCC Charter Act, 15 U.S.C. § 714, the Con-gressional statute that establishes the agency. Although other statutes and regulations authorize agency offset procedures, the Secretary does not rely on those other statutes to justify her actions against Plaintiffs, presumably because those statutes do not allow the CCC to offset debts against non-debtor entities. For example, the Federal Claim Collection Act (FCCA), 31 U.S.C. § 3701 *et seq.* generally governs claims of the United States government. Section 3716 deals with administrative offset, and § 3716(b) provides,

> Before collecting a claim by administrative offset, the head of an executive, judicial, or legislative agency must either—
>
> (1) adopt, without change, regulations on collecting by administrative offset promulgated by the Department of Justice, the General Accounting Office, or the Department of Treasury; or
>
> (2) prescribe regulations on collecting by administrative offset consistent with the regulations referred to in paragraph (1) [describing notice and opportunity requirements].

The Department of Agriculture has followed this statute, and issued its own debt collection standards, including 7 C.F.R. § 3.21.[6] In particular, § 3.21(b) notes that "[a]n agency head may adopt regulations, in accordance with the Debt Collection Act and the Joint Regulations, setting out agency procedures for the collection by administrative offset of such claim and debts [of the agency]." Further, it provides that "[i]f the head of the agency of the Department adopts regulations separate from this subpart, the procedures thereby established, rather than those set out in this part, shall be followed for the

---

6. The source of the Secretary's authority for issuing 7 C.F.R. § 3.21 is the Federal Claims Collection Act of 1966, as amended by the

Debt Collections Act of 1982, codified at 31 U.S.C. § 3701 *et seq.* 55 Fed.Reg. 38662.

collection of the claims and debts to which the separate regulations apply."

However, in establishing the offset procedure in § 1403.7(q), the Secretary specifically did not rely on the procedures set forth by the FCCA and its implementing regulations. Rather, the Secretary Stated that "[t]he CCC Charter Act, as amended (15 U.S.C. § 714, et seq.), provides that CCC shall have the authority to make final and conclusive settlement and adjustment of any claims by or against it irrespective of the amount at issue. CCC is, therefore, not subject to the provisions of the [FCCA] or its implementing regulations." 60 FR 43705. The Secretary's interpretation of her independent authority to issue offset regulations is supported by 31 U.S.C. § 3716(d) itself, which provides that "[n]othing in this section is intended to prohibit the use of any other administrative offset authority existing under statute or common law." [7] Thus, the Secretary is not bound by the procedures of the FCCA itself if the CCC had authority to issue such regulations on its own.

In fact, the regulatory history shows that the Department of Agriculture adopted its expanded offset powers under § 1403(q) pursuant to 15 U.S.C. §§ 714b and 714c, precisely in order to collect debts from debtors such as those associated with the Plaintiff entities. The history notes that:

> in the past debtors have avoided offset of their program payments by reorganizing their farming operations, changing the name of their operations, transferring ownership of their operations, receiving payments under more than one entity, or by changing the payee in some other manner. In order to increase CFSA's and CCC's ability to collect delinquent debts, without adversely affecting other non-debtors, the regulations are amended to provide for offset of a debtor's pro rata share of payments due any entity which the debtor participates in, either directly or indirectly.... By allowing for this expanded ability to offset, CFSA and CCC will substantially increase their ability to collect delinquent debt in an efficient and effective manner. This will also help ensure that those owing delinquent debts are not continuing to receive government payments, without first satisfying their debts.... This regulation will protect the financial integrity of many Federal agricultural programs by ensuring the Government will be able to collect, or otherwise settle, debts owed it by any person, organization, corporation, or other legal entity.

60 Fed.Reg. 43706. The cited authority for this expanded power is 15 U.S.C. §§ 714b and 714c. *Id.*

Plaintiffs argue, however, that there is simply no authority granted by Congress to CCC under § 714b and § 714c to implement such a rule. The Secretary disagrees.

■ An agency must have Congressional authority in order to take action. *Gorbach v. Reno*, 219 F.3d 1087, 1093 (9th Cir.2000) (*en banc*); *see Atlantic City Electric Co. v. FERC*, 295 F.3d 1, 8 (D.C.Cir.2002) ("In the absence of statutory authorization for its act, an agency's 'action is plainly contrary to law and cannot stand.'") (quoting *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C.Cir.2001)). An agency's interpretation of its own statutory authority to issue a regulation under a notice-and-comment rulemaking procedure is subject to judicial deference outlined by *Chevron U.S.A., Inc. v. Natural Res. Def.*

---

**7.** Thus, Plaintiffs' fifth claim for relief, that the Secretary was required to comply with the mandates of the FCCA, fails if the CCC had independent statutory administrative offset authority, because the FCCA by its own terms, does not preempt any such authority.

*Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *Wilderness Society v. United States Fish & Wildlife Serv.,* 316 F.3d 913, 921 (9th Cir.2003). In exercising *Chevron* deference, the Court must perform a two-step analysis: "(1) If the statute is unambiguous and the intent of Congress is clear [the Court] must give effect to that ambiguous intent; but (2) if the statute is ambiguous, Congress has implicitly left a gap for [the agency] to fill." *Id.* at 922; *see also California Dep't of Social Serv. v. Thompson,* 321 F.3d 835, 847 (9th Cir.2003) (outlining and applying *Chevron* steps). "In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 922 (quoting *Chevron,* 467 U.S. at 844, 104 S.Ct. 2778). Further, when the statute grants an agency authority to make rules and regulations as necessary to carry out the provisions of the statute, the Court must defer if the regulation is "reasonably related to the purposes of the enabling legislation." *Mourning v. Family Pub. Serv., Inc.,* 411 U.S. 356, 369, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973).

■ There are two subsections of § 714b, which defines the "[g]eneral powers" of the CCC, relating to the Secretary's powers to authorize the offset provisions of 7 C.F.R. § 1403.7(q). First, 15 U.S.C § 714b(k) specifies that the CCC "[s]hall have authority to make final and conclusive settlement and adjustment of any claims by or against the [CCC] or the accounts of its fiscal officers." Second, § 714b(j) provides that the CCC "[s]hall determine the character of and the necessity for its obligations and expenditures and the manner in which they shall be incurred, allowed, or paid." In each case, the CCC is granted powers in relation to "claims *by or against* the [CCC]" and "*its* obligations and expenditures." The statute unambiguously specifies the CCC's authority over *its own* claims.

The Secretary concedes that § 714b(j) does not apply, because the offset claims are not by or against the CCC. However, the Secretary argues that she has the authority to adjust the "obligations and expenditures" of the CCC and the "manner" in which they are paid under § 714b(j). Under this interpretation, the Secretary may statutorily exercise her authority to adjust the amount of payments due any entity receiving CCC payments by the amount of debt due another agency by one of its shareholders.

A review of the legislative history makes it clear that the Secretary's power is authorized under § 714b(j), because the claim adjustment power in § 714b(k) is described as a subset of the CCC's general corporate powers to adjust its obligations and expenditures under § 714b(j). The CCC Charter Act was passed in 1948, and the Senate Report expressly incorporates and adopts a detailed statement by the Secretary outlining the meaning of the Act. That statement explains that "[s]ubsection (j) grants the Corporation the authority, essential to the effective conduct of its business as a corporate entity, to determine the character of and necessity for its obligations and expenditures and the manner in which they shall be incurred, allowed, and paid. This is a common provision of Federal corporate charters." 1948 U.S.Code Cong. Service at 2150. The next section makes clear that subsection (j) includes the power to settle and adjust claims: "Subsection (k) explicitly vests in the Corporation the authority, *implicit in subsection (j),* to make final and conclusive settlement and adjustment of claims by or against the Corporation or the accounts of its fiscal officers. This power has been exercised by the [CCC] since its creation...." *Id.* (emphasis added). The paragraph continues, "[a] corporation such as the [CCC], engaged in a multitude of commercial transactions, must be able ex-

peditiously to adjust, compromise, and settle its claims in order to efficiently conduct its business." *Id.* Similarly, the Senate Report adopts a subcommittee statement which states, "[t]he complexity of the demands on the [CCC] is apparent.... [F]lexibility of operation must be provided to carry out these responsibilities. The corporate structure within the Department of Agriculture which provides close integration with other activities of the Department... [is] considered essential for the effective operation of the Corporation." 1948 U.S.Code Cong. Service at 2140.

Thus, the legislative history reveals that the CCC has broad powers to adjust its expenditures under the CCC Charter Act, just as any other corporation. The CCC's power to settle and adjust its own claims under § 714b(k) is explicitly a subset of its expenditure power under § 714b(j). The CCC's power to settle and adjust claims owed to other agencies by altering *its own* expenditures—here, by adjusting the amount of its payments to the Plaintiffs by the pro rata amount of the individual debt—follows from the plain language of the statute. In both cases, the CCC is using its statutorily-granted flexibility to determine the "necessity for its obligations and expenditures and the manner in which they shall be incurred, allowed, or paid." Notably, the CCC's corporate structure is designed to "provide[ ] close integration with other activities of the Department" and is "considered essential for the effective operation of the Corporation." *Id.* at 2140. Therefore, the CCC's debt collection offsets are authorized by the language of the statute and Congressional intent, or, at the very least, constitute a reasonable agency interpretation of its own power. *See Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778 ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give

effect to the unambiguously expressed intent of Congress.").

As a final matter, Plaintiffs argue that the offsets were not authorized because the CCC Charter Act contains limitations on the CCC's exercise of general powers in § 714c. Under the statute, any actions taken pursuant to § 714b, which lists the "general powers" of the CCC, are subject to the limitations of 15 U.S.C. § 714c, which provides that "the Corporation is authorized to use its general powers only to -," followed by a list of eight goals. Plaintiffs argue that the offsets serve no purpose listed in § 714c. The Secretary contends the offsets fall within two goals: § 714c(h), which states that the CCC may "[c]arry out such other operations as the Congress may specifically authorize or provide for;" and § 714c(a), providing that the CCC "[s]upport the prices of agricultural commodities through loans, purchases, payments, and other operations." The Court finds that the Secretary's reliance on § 714c(a) is persuasive and entitled deference under *Chevron.* As the Secretary notes, the collection of debts to fund farm subsidy programs is reasonably related to implementing a system that supports the prices of agricultural commodities through loans and other operations. *See* 60 Fed.Reg. 43706 ("This regulation will protect the financial integrity of many Federal agricultural programs by ensuring the Government will be able to collect, or otherwise settle, debts owed it by any person, organization, corporation, or other legal entity."). Further, Plaintiffs' strict interpretation of the limits of § 714c are too narrow; if § 714c was read narrowly, the CCC would not have the power to offset its own debts, yet § 714b(k) and legislative history clearly indicate that the CCC has such authority. The offsets are reasonably related to maintaining agricultural price support operations.

**(2) Can the CCC offset the debts pursuant to the terms of the contract?**

■ The Secretary proffers an alternative ground for her authority to offset the debts. The Secretary's alternative argument is that the PFCs that Plaintiffs signed with the CCC authorize the CCC to deduct pro rata debts owed to other Department of Agriculture agencies, because the PFCs incorporate the applicable CCC regulations. The Secretary argues that the PFCs were executed expressly subject to acceptance of the conditions of CCC regulations. In short, the Secretary argues that even if § 1403.7(q) is not a valid exercise of the CCC's authority, the contracts incorporated the provisions of § 1403.7(q), and the Secretary is entitled to enforce the provisions of the contract.

Although the Court has already determined that the Secretary had the authority to offset the debts under § 1403.7(q), the Court will consider whether the Secretary had such authority to do so by enforcing the terms of the contract. As discussed in Part B, *infra*, the enforcement mechanism relates to the Secretary's due process obligations.

Every PFC signed by the Plaintiffs contains a form designated CCC–478, which states the following: "This contract to participate is entered into between the Commodity Credit Corporation (CCC) and the undersigned producers.... The terms and conditions of the production flexibility contract are contained in the CCC–478 Appendix.... By signing this contract, producers acknowledge receipt of the CCC–478 Appendix, and agree to abide by the terms contained therein...." *See* App. 3 to Pl's Resp. [Doc. # 123]. Part 3(H) of the Appendix to Form CCC–478 provides that, "[b]y signing Form CCC–478 the producers on a farm agree that: [t]he regula-

tions at 7 CFR Parts 12, 718, and 1412 are incorporated by reference as part of this contract...." App. 4 to Pl's Resp. In turn, 7 C.F.R. § 1412.406(a) (1999)[8] provides that "[t]he regulations governing offsets and withholdings found at part 1403 of this chapter shall be applicable to contract payments." App. 5 to Pl's Resp. Finally, as previously discussed, 7 C.F.R. § 1403.7 provides that the Secretary may offset debts due the FSA by shareholders. The Secretary argues that this chain of references effectively incorporated the regulations into the contract.

The CCC does have authority to make and enforce contracts independent of its debt collection powers discussed in the previous section. The CCC Charter Act allows the CCC to enter into contracts in furtherance of its goals. Specifically, 15 U.S.C. § 714b(g) provides that the CCC "[m]ay enter into and carry out such contracts or agreements as are necessary in the conduct of its business...." It also provides that "[s]tate and local regulatory laws or rules shall not be applicable with respect to contracts or agreements of the Corporation or the parties thereto to the extent such contract or agreements provide that such laws or rules shall not be applicable, or to the extent that such laws or rules are inconsistent with such contracts or agreements." Pursuant to this statute, the CCC had the authority to define the terms of its production contracts "as necessary in the conduct of its business." *See Chevron*, 467 U.S. at 844, 104 S.Ct. 2778; *Mourning*, 411 U.S. at 369, 93 S.Ct. 1652.

Nevertheless, Plaintiffs vehemently dispute the power of the Secretary to enforce the regulations pursuant to the terms of the contract. Plaintiffs' primary argument

---

**8.** The former 7 C.F.R. § 1412.406(a), as it existed when the PFCs were signed, has now been altered or moved, though the parties do not inform the Court of its current form and location.

is that the terms of the contract may not act to override their constitutional or statutory rights. Plaintiffs repeatedly identify those protected rights as grounded in state corporate law, arguing that they are shielded by the protections of state corporate law from the Secretary's administrative offset, because corporations are not generally liable for the debts of their shareholders. The reliance upon state law is unavailing, because the CCC's statutory authority specifically provides that CCC contracts preempt any inconsistent state law. *See Montana v. United States*, 124 F.3d 1269, 1275 (Fed.Cir.1997) (terms of CCC contract preempt inconsistent commercial state law); *Sebastopol Meat Co. v. Secretary of Agriculture*, 440 F.2d 983, 985 (9th Cir.1971) (allowing cease and desist order against shareholder of a corporation notwithstanding limitations of state law and holding "[w]e do not think that state law limitations on the alter ego theory or doctrine are necessarily controlling in determining the permitted scope of remedial orders under federal regulatory statutes"); *Buckeye Sugars, Inc. v. Commodity Credit Corp.*, 744 F.2d 1240, 1244 (6th Cir.1984) (§ 714b(g) makes inapplicable state laws which are inconsistent with the terms of CCC loan contract).[9] Thus, the Secretary may enforce the contracts with the entities notwithstanding the formalities of state corporate law; this arrangement is no different than the Secretary enforcing a valid contract against one individual who has contracted to be liable for the debts of another individual. Whether or not Plaintiffs are corporations or individuals, they may contract to be liable for the debts of another.

The Court does not agree, however, with the Secretary's contention that the Secretary could enforce an otherwise *ultra vires* regulation by incorporating a reference to the regulation in a contract. Because the Court concludes that § 1403.7(q) is valid regulation, the Court need not rule on these grounds. Nevertheless, there are competing precedents on whether parties may incorporate regulations lacking the force of law into an enforceable section of a contract. In *Ball, Ball & Brosamer, Inc. v. Reich*, 24 F.3d 1447 (D.C.Cir.1994), the D.C. Circuit held invalid a Department of Labor regulation mandating that certain government contracts contain a provision that "[a]ll rulings and interpretations of the Davis–Bacon and Related Acts contained in 29 CFR parts 1, 3, and 5 are herein incorporated by reference in this contract." *Id.* at 1450. The Court disregarded this provision of the contract, and instead itself decided whether the regulations at issue were consistent with the Davis–Bacon Act. The Court reasoned that the mandatory incorporation of federal regulations into a contract amounted to an end-run of judicial review of departmental regulations:

> This application of the incorporation clause forecloses all judicial review of the validity of the Secretary's regulations when those regulations are later applied to a particular contractor in an adjudicatory setting. Such an attempt to limit judicial review runs counter to the fundamental principles of reviewability underlying the Administrative Procedure Act.... Insofar as the incorporation clause purports to shield the

9. *Dole Food Co. v. Patrickson*, 538 U.S. 468, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003), relied upon by Plaintiffs, is not to the contrary. *Dole* held that, in interpreting the Foreign Sovereign Immunities Act, the Court should interpret Congressional language consistent with general corporate formalities. It created

no general presumption against overriding state corporate formalities, and, as the cited cases demonstrate, would be inapplicable to CCC contracts where Congress has explicitly provided for preemption of contrary state laws.

Secretary's regulations from APA review in the courts, it is invalid and unenforceable.

*Id.* at 1450–51.

On the other hand, in *Woodside Village v. United States Dep't of Labor,* 611 F.2d 312 (9th Cir.1980) (*per curiam*), the Ninth Circuit held enforceable a government contract that tied its wage rates to wage determinations made by the Department of Labor pursuant to the Davis–Bacon Act, even though the applicability of the Davis–Bacon Act had been suspended by executive order. The private contractor was not legally compelled to follow the Department of Labor regulations, but for the incorporation provision in the contract. The Ninth Circuit held, "[n]othing in the Davis–Bacon Act precludes the parties from contracting with reference to it, even if by proper interpretation its requirements may not have been applicable by force of law to the project in question. . . . [P]laintiff . . . voluntarily and knowingly agreed to perform the contract in conformity with and subject to the minimum wage requirements of the Davis–Bacon Act." *Id.* at 315–16.

The D.C. Circuit distinguished the Ninth Circuit's holding in *Woodside Village,* finding a difference between a situation where parties freely contract to incorporate federal government regulations, and a situation where the federal government insists on contract incorporation of its own regulations to shield the regulations from administrative challenge. In *Vulcan Arbor Hill Corp. v. Reich,* 81 F.3d 1110, 1115 (D.C.Cir.1996), the Court held it "axiomatic that even if a contractor or developer is not required by force of statute to pay Davis–Bacon wages, it can nonetheless bind itself to do so by contract." (citing *Woodside Village*). In distinguishing *Ball,* the Court noted that "[h]ere, however, Arbor Hill had a choice between acceding to the Davis–Bacon directive . . . or

administratively challenging it. The choice of contract language was left up to Arbor Hill and the City of Albany, and was not, as in [*Ball*], compelled by an regulation aimed at precluding judicial review." *Vulcan,* 81 F.3d at 1115, n. 7.

The Court finds another distinction between *Ball* and *Woodside Village:* in *Ball,* the government claimed the power to enforce an *ultra vires* regulation by incorporating it into a contract, whereas in *Woodside Village,* the parties incorporated a regulation which was legally promulgated but (through no actions of the parties) simply not in force. The Secretary does not have the power to contractually enforce a regulation that was *illegally* made, even if she may insist on contractually enforcing a regulation even if, for some reason, that regulation changes and is no longer in force. Further, the Court notes that the Secretary's position in this case is analogous to the position rejected in *Ball.* Here, the Department that itself promulgates the regulations is claiming that the contract incorporation effectively "forecloses all judicial review of the validity of the Secretary's regulations when those regulations are later applied to a particular contractor in an adjudicatory setting." *Id.* at 1450.

Though the Court disagrees with the Secretary's position on this issue, the Court concludes that the CCC had the authority to enforce the administrative offset pursuant to the terms of the contract, because § 1403.7 was incorporated as part of the terms of the contract and was promulgated pursuant to the CCC's statutory authority.

**B. Constitutional claims**

■ Plaintiffs allege a variety of constitutional challenges to the administrative offset: deprivation of property without meaningful procedures to challenge the de-

privation under the Due Process Clause of the Fifth Amendment, an unlawful taking without just compensation in violation of the Takings Clause of the Fifth Amendment, unlawful seizure of property in violation of the Fourth Amendment, and a violation of substantive due process under the Fifth Amendment.

Plaintiffs' strongest constitutional argument is a procedural due process claim that they were denied notice and an opportunity to challenge the administrative offset. The Secretary concedes that, although the individual debtors were provided notice and a hearing to challenge the impending offset, the corporations themselves were provided no such notice and hearing rights. "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). However, "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." *Id.* at 334, 96 S.Ct. 893 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)).

The Court must balance three factors to determine if Plaintiffs were entitled to a hearing to challenge the Secretary's administrative offsets: "[f]irst, the private interest that will be affected by the official action; second, the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved, and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335, 96 S.Ct. 893. All three factors indicate that Plaintiffs are not entitled to a hearing to challenge the administrative offset.

As an initial matter, Plaintiffs' private interest is the receipt of payments due under the Production Flexibility Contracts. However, while Plaintiffs have an interest in the funds, the PFCs they signed incorporate the regulation allowing the Secretary to conduct pro rata offsets of debts due any government agency by individual shareholders. Thus, Plaintiffs' entitlement to receive the funds is subject to the terms and conditions of the contract. Both parties to the contract are entitled to the benefit of the bargain of the contract.

Also, Plaintiffs' private interest in a hearing is minimal because they do not challenge the accuracy of the amount of money that was offset. Where there is no factual dispute to challenge in a hearing, there is no requirement of a hearing. In *Codd v. Velger*, 429 U.S. 624, 627, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977), the Supreme Court rejected the argument that a former city employee had a right to a hearing to challenge information contained in his personnel file, because the employee did not allege any factual dispute regarding the information. The Court held that "if a hearing mandated by the Due Process clause is to serve any useful purpose, there must some factual dispute ... When we consider the nature of the interest sought to be protected, we believe that the absence of any such allegation or finding [that the information was false] is fatal to [the employee's] claim under the Due Process Clause that he should have been given a hearing." *Id.* at 627, 97 S.Ct. 882. Similarly, Plaintiffs' interest in a hearing in this case is not strong because a hearing would not serve to protect Plaintiffs' interest in the funds.

As for the second *Eldridge* factor, the risk of erroneous deprivation of property is low because the Secretary provides notice and a hearing to the individuals debtors. While this notice and hearing may

not be imputed to the Plaintiff entities merely because the individuals are shareholders, the individual debtors' notice and hearing help ensure the accuracy of the Secretary's actions by allowing the debtors to challenge any mistakes or errors by the Secretary. The only factual issue that may not be raised in the individual debtors' hearing is the debtors' pro rata shares in the Plaintiff entities. However, Plaintiffs concede that they do not challenge the Secretary's determination of pro rata shares. In this circumstance, an additional hearing provides no added level of protection against error, particularly because the Plaintiffs do not challenge the accuracy of the amount offset. *See Codd*, 429 U.S. at 627, 97 S.Ct. 882; *Alvin v. Suzuki*, 227 F.3d 107, 121 (3d Cir.2000) (in tenure case, where "there was simply no factual dispute that pre-deprivation notice or hearing could have addressed," holding "the 'risk of error,' as it were, was nonexistent" and there was no right to hearing).

Finally, the third *Eldridge* factors weighs in favor of the government's interest in collecting unpaid debts. *See, e.g., Cecile Industries, Inc. v. Cheney*, 995 F.2d 1052, 1055 (Fed.Cir.1993) (noting that contractual offset is valuable tool for debt collection and "[i]ndisputably, the Government has long enjoyed the right to offset contract debts to the United States against contract payment due the debtor"). In response, Plaintiffs argue repeatedly that the government has no legitimate interest in holding one entity liable for the debts of another. While this argument has some merit as a general proposition, in this instance, however, the Secretary has provided specific, legitimate reasons for collecting debts against the Plaintiff entities. *See* 60 Fed.Reg. 43706 ("By allowing for this expanded ability to offset, CFSA and CCC will substantially increase their ability to collect delinquent debt in an efficient and effective manner. This will also help ensure that those owing delinquent debts

are not continuing to receive government payments, without first satisfying their debts...."). Notably, the Plaintiff entities signed the PFCs with full knowledge of the applicable regulation and terms of the contract, and the government has a strong interest in enforcing the terms of a contract with federal aid recipients under a federal program, especially where that aid recipients knowingly and willingly entered into the contracts, and are themselves experienced and repeat players in the federal program. Finally, the added fiscal and administrative burden of providing hearings for all entities against whom debts are collected, in addition to the notice and hearings provided to the debtors, would be high and, as discussed above, would not significantly enhance the fairness of the procedure.

■ Plaintiff's Fourth Amendment claim, takings claim, and substantive due process claim are without merit, and Plaintiffs only briefly defend their legal foundations in their Response. The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and has no applicability to regulatory or contractual payments by the government. *See United States v. Attson*, 900 F.2d 1427, 1430, 1432 (9th Cir.1990) ("[W]hen the [Supreme] Court has consider the application of the fourth amendment to governmental conduct in a noncriminal context, it has been careful to observe that the amendment is limited.... [A]t its core the fourth amendment was designed to apply to the conduct of law enforcement officials engaged in criminal investigations and that if the application of the fourth amendment is to expand beyond that core, the conduct to which it expands must approximate the types of activities to which the amendment is primarily directed....").

The Fifth Amendment provides that "private property [shall not] be taken for public use without just compensation." The offset of contractual payments here is not a taking of property within the Supreme Court's framework of physical takings or regulatory takings. *See Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 322–24, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) (outlining cases stating takings claims). Plaintiffs' best argument that the Secretary's actions constitute a takings claim—though an argument they do not make—is that the Secretary's offset actions fit into the framework of "economic regulation" takings under *Eastern Enterprises v. Apfel*, 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998).[10] In *Eastern Enterprises*, the Court, without a majority opinion, held unconstitutional a law that required a former mine operator to retroactively fund health benefits for retired miners. The plurality noted that "Congress has considerable leeway to fashion economic legislation, including the power to affect contractual commitments between private parties. . . . Our decision, however, have left open the possibility that legislation might be unconstitutional if it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability is substantially disproportionate to the parties' experience." *Id.* at 528–29, 118 S.Ct. 2131. The plurality specified three factors to be considered to determine whether economic legislation constitutes a taking: the economic impact of a regulation, its interference with reasonable investment backed expectations, and the character of government action. *Id.* at 523–24, 118 S.Ct. 2131. *See also Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 223–25, 106 S.Ct. 1018,

89 L.Ed.2d 166 (1986) (outlining three factors but noting "[g]iven the propriety of the governmental power to regulate, it cannot be said that the Taking Clause is violated whenever legislation requires one person to use his or her assets for the benefit of another").

Even under the *Eastern Enterprises* plurality opinion, the Secretary's actions did not constitute a taking because the regulations were not *retroactively* imposed. *See id.* at 532–23, 118 S.Ct. 2131 (emphasizing importance of unfairness of retroactivity of law). The Secretary's offset authority under 7 C.F.R. § 1403.7(q) was effective August 25, 1995. *See* 60 Fed.Reg. 43705. However, Plaintiff entered into the PFCs in 1996, with full knowledge of the applicable regulations. Further, as previously discussed, the regulations were incorporated into a contract signed with the government. Thus, Plaintiffs' reasonable expectations in the receipt of contract payments under the PFCs were not violated; they were aware that signing a contract with the Department of Agriculture would subject them to administrative offset of the debts of their shareholders. Accordingly, there is no violation of the takings clause.

Finally, Plaintiffs' substantive due process claim, which is very briefly mentioned but never explained, has no merit. A contractual entitlement to receipt of federal payments is not a fundamental right protected by the due process clause. *See Local 342, Long Island Public Serv. Employees v. Town Board of Town of Huntington*, 31 F.3d 1191, 1196 (2d Cir.1994) (citing *Reno v. Flores*, 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993)) (collecting authorities). Further, since Plaintiffs are challenging a deprivation of prop-

10. Although not cited in the Plaintiffs' papers, Plaintiffs briefly discussed *Eastern Enterprises* at the hearing in response to a Court request to provide case law for their constitutional claims.

erty, the Court must analyze the challenge under the Takings Clause rather than general due process. *See Armendariz v. Penman,* 75 F.3d 1311, 1320 (9th Cir.1996) (regulatory takings claims should be analyzed under Takings Clause jurisprudence rather than general guidelines of substantive due process). As noted above, the takings claim fails. Finally, because the Secretary has not infringed a fundamental right, she need only show a rational basis for her actions, and, as described above, the efficient and effective collection of debt against entities that are seeking to evade payment is sufficient. *Flores,* 507 U.S. at 304, 113 S.Ct. 1439.

Accordingly,

**IT IS ORDERED** that Plaintiffs' Motion for Summary Judgment [Doc. # 96] is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment [Doc. # 109] is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Strike Defendants' Reply [Doc. # 128] is **DENIED AS MOOT.**

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Strike Defendants' Statement of Facts [Doc. # 119] is **DENIED AS MOOT.**

**IT IS FURTHER ORDERED** that this case is **DISMISSED WITH PREJUDICE.**